We're here on Gerovic v. City and County of Denver, 22-11-48, and I understand the appellees will split your time, and of course, that'll depend on you, on how you divvy that up. We'll hear from the appellant, Mr. Davidovich.  You are absolutely correct, but now I'm off mute. You can hear me okay now. Good afternoon, Your Honors. First, I want to thank you for allowing me to have this hearing by Zoom. It's much appreciated, because I'm very far from Denver at the moment. Let me just talk briefly about this case. Obviously, you've gone through the briefs. My client, Amina Gerovic, is a naturalized Bosnian-Caucasian citizen, U.S. citizen. She began her employment with the City and County of Denver about 2014. She was under the supervision of Leroy Lemos, an Hispanic supervisor above her supervisor. He, in fact, was the person who supervised all the custodians. And she experienced nothing but a constant display of harassment and discrimination of her because she was non-Hispanic. And it's not just her opinions, but she actually observed all of these things. Now, the defendants and the court in denying our opposition to summary judgment and granting summary judgment held that she hadn't established a prima facie case, that she would not have been fired, but for the fact that she was non-Caucasian. In fact, the situation is if you don't go with McDonnell Douglas, you simply have the opportunity to show that by reasonable inference. She only had to show by reasonable inference that she would not have been fired, but for her race. So that's that's what the notary case says. This is a reverse discrimination case, but we're not relying on the McDonnell judgment matters. So we don't have to show that. But for but rather, was there a reasonable inference? Mr. Davidovich, are you saying that you are not relying on circumstantial evidence and you're relying on direct evidence? Absolutely. Absolutely. I mean, direct evidence plus inferences from the direct evidence, of course. What's the direct evidence? Oh, the direct evidence is her own eyewitness testimony as to things that she saw. We have a man who. We have a number of things. First of all, the direct evidence that she shouldn't have been fired for a Facebook post comes from their own human resource person, Christine Howard, who said that normally she said often it's enough to let the employee know this has come to our attention and clarify expectations, but not to terminate. Mr. Davidovich, can I ask you a little bit about that? Typically, we would look at an email like Christina Howard's and say that is circumstantial evidence. You're relying on Ms. Howard's email to show that there was a deviation of policy. And a lot of our cases talk about a deviation of policy as a way to show pretext. But typically, I'm not I don't know of a case saying that you could look at a case involving an email suggesting a deviation of policy and say that that is direct evidence. And that would allow you to insulate yourself from McDonnell Douglas. Let me let me clarify by saying this. It's email is direct evidence and the email itself leads one to certain conclusions. The email itself leads you to the conclusions that, in fact, this shouldn't have happened. So then you have to look at why. Why did this happen? Then you get into the question of Mr. Davidovich. If we have to draw conclusions, some of us call those inferences, then that means necessarily it is not direct evidence. It is evidence from which you must draw inferences to arrive at the conclusion that you would want us to. There is a gray line where they intercede. In fact. You have the direct evidence and you take it from that. That is an inference from that. Then you have other direct evidence. You have evidence of all of the people that she saw with her own eyes. His Hispanic people who are being treated differently. That's not an inference. That's a fact. Specifically, could you give us one of those comparators? Someone who is Hispanic and in similarly situated situation did the same thing she did and was not terminated. Sure. Let me give you a number of them, if I may, Your Honor. Violet Chacon. She was a lady who was a custodian, Hispanic. The defense refers to her as being terminated and she was terminated ultimately. But she was terminated in 2017 where she committed offenses in 2015, which included lying, lying to her supervisor. And she was given and she was given a 10 day suspension. And your client was given for her first violation and your client was given a written reprimand. Your client for the first disciplinary infraction received actually a lesser penalty than the comparator did. My client denied the events that for which she received a termination. Ms. Chacon admitted finally after seeing the video, she admitted that she had been lying. My client has maintained throughout, which is which is a I think a factual matter to be determined by a jury that she was telling the truth. Telling the truth about what? Because the written reprimand was about the May 2017 episode. Yes. She stated this is regarding the building episode. Right. And she testified that she did not let anybody into the building. The police investigation who tried to bring that to the attention of Mr. Lemos and the higher ups in the city of Denver corroborated that she did exactly the right thing. Yet she was written up for that and given a disciplinary writing. She disagreed with that. That's a question of credibility. There question of whether you believe whether you believe Lemos and the city or you believe my client. That cannot be that determination of credibility should not have been made by the district court judge. That's that's what I talked over my colleague, Judge Murphy, Judge Murphy. Did you have a question? I had the same question you did. I want him to answer your question. I'm sorry. Oh, you may proceed. I was just going to say you may proceed. There are other examples that you witnessed personally. Daniel Garcia. She was rude to a customer, point her middle finger at her. She was given a short suspension, a pay cut. Teresa Yolanda. Constantly, she heard Lemos yelling at her and saying he's going to keep giving her write ups, but she was never fired. Well, counsel, don't we don't we have a very different scenario as regards your client that is basically holding herself out to be a police officer on Facebook? Do you have anyone, any comparator that comes close to that? I don't have a comparative hold holding himself as a police officer on Facebook. I don't have another Facebook situation except with Mr. Mr. Lemos posting what I feel were anti white Facebook posts. But that's not a he wasn't holding himself out. I also do not feel that she was holding herself out as a police officer. She's, you know, she came from Bosnia. And she. The whole scenario with the police police here was it happened at a party retirement party when the police officers. They had her put their head weren't there weren't there responses on her Facebook posts that would indicate at least one individual thought she was in fact a police officer. There was one from the translation that they gave. There was an individual who said who indicated that. Correct. Also, the Facebook post was two years before the investigation to began. It was 2015. Right. But how does that help you, Mr. David, because it appears that Miss Forsberg was nobody was aware of it at Denver until Miss Forsberg had talked in May to her daycare provider and told her about this. And they promptly initiated an investigation. So the fact that it how does it help you that that she put on the post two years earlier if nobody knew about it. The. Again, just the fact that the investigation was given was done by Lemos only not by. He did all the investigations, he's a man who were accusing him and she's complaining of discrimination and complaining within within a month, almost contemporaneously with the discipline in September of 2017. So here. So here, there's a lot of focus in your briefing and on your argument on Mr. Lemos, he did not have the authority to terminate her right. He did not have the written authority to terminate her. The testimony is from Mr. Williamson himself the person who actually signed the termination. And for Mr. O'Neill. That was Mr. Lemos. Only Mr. Lemos upon whom they rely to determine whether or not discipline should be administered. I don't know that Mr. Davidovich and I don't want to argue with you but can I ask you because I read pages 36 and 37 of the appendix in volume three where you cite Mr. O'Neill's testimony and I thought Mr. O'Neill was pretty clear that all he said was that he was the day to day supervisor for miscarriage. And so, Mr. And so himself, Mr. O'Neill or Mr. Williamson, of course, would have relied on what he had said, Mr. Lemos had said as the day to day supervisor but I didn't see anything in that. In the O'Neill deposition where he said that Mr. Williamson would have relied or did rely on anything, Mr. Lemos had said about whether to terminate him in November. Sorry, the words terminate November not there. But, but she tested first of all, this drove it testified that Williamson said said, I can't do anything. In May, in May, in May, yes, of course, of course, the written reprimand. She didn't, nobody in Denver even knew, I'm not trying to argue with you but but I don't see how that helps you either, because she wasn't fired for the May episode she was met, she was fired for what nobody even learned about until September. But you've got to you got to go to the continuum from there. Correct. She wasn't threatened to be fired in May, but she was taught in April, April, May, she was told that that first of all, Williamson said, I can't do anything. Further, she was O'Neill said that any decision we make is based upon what Lemos says to us, and other things, never, never testify what the other things were. So I think that's enough to show a pattern, and then they allow them to investigate. I see I'm running out of time. And I wanted to just get a couple of other points but I really want to reserve a couple of couple of minutes for rebuttal. Okay. Okay, Kevin. Would you mind stopping Mr David Mitchell's clock, I do. We're going to stop your clock. So this isn't inhibiting your rebuttal but I do want to make sure my colleagues have a chance to ask all their questions. Judge Briscoe Do you have any additional questions. Thank you. Okay, Judge Murphy, do you know but I want to talk to Kevin, Kevin. I lost Judge Briscoe on my screen. Me too. I also lost her. Well, that's okay. As long as you can hear me I'm happy. Here we go. Here we go. Oh, now you're back. Welcome back. Thank you. I missed you. Thank you. All right, we'll hear from the, the appellees Mr today. Good afternoon, your honors, may it please the court, Jonathan Saudi on behalf of the city and county of Denver, its agency, and its employees. The court should affirm the district courts willing dismissing all of Mr of exclaims for the reasons set forth in the city's brief but today, I'd like to focus more specifically on three questions that are before the court. Whether Mr established a reasonable inference of but for causation which the court just discussed with counsel for Mr. Because of whether she presented a causal connection or any evidence of pretext. And the answer to all three of these questions is no she is not a prima facie case of reverse discrimination requires more. Here it requires a reasonable inference that had Mr. Not been Caucasian she would not have been fired. But she did not provide sufficient evidence to establish such an inference of but for cause, as the district court noted in dismissing or claims Mr points to a handful of alleged misconduct by Hispanic city employees that have been discussed today as comparators, that did not result in those proper comparisons of the treatment, such as disciplinary histories of those employees or an identification of their supervisors. This court has made it clear and Watts and McGowan, that the burden is on the employee to show that she is similarly situated in all relevant respects to the employees with whom she's comparing herself. And that requires at a minimum that they share the same supervisor, and that the conduct be of comparable seriousness, under Arambuda and Kendrick. Mr. Felt to show that the employees with whom she attempts to compare herself or subject to the same direct supervisor, or that the conduct for which the other Hispanic employees she points to was comparably serious to her own. Let me press you on that. However, now, for, for the first reprimand for the for this garbage is reprimand and Mr cones 10 day 10 day suspension. Why are those relevant, because the defendant has taken the position that she was only she was terminated only for the Facebook episode not because she, this was her second or third infraction. Well, I think your honor, what we did is made it clear in the briefing that Mr. In comparison to the statements that were provided by other employees and security personnel just were simply not credible. And that's where the determination was made when she received a written reprimand that her acts were simply dishonest as part of the investigation. And so the city views that as the 1st act of dishonesty. And then the city views the determination decision, where, similarly, that, you know, Miss drug was interviewed as part of that investigation. After those Facebook posts were discovered, and then it was also determined that at that point, that Mr. It was not being forthcoming incredible, and it was determined that she was being dishonest under the same rule. And so we take the position that those are the 2 incidents similar to Mr. Cone, who has a reasonable comparator was received a suspension for her 1st act of dishonesty with the plant. And then ultimately received determination as a result of that 2nd, active dishonesty. So, Mr. next attempts to argue that all the employees ultimately have the same supervisor, because all of their supervisors reported to the same 2nd level supervisor. And that's Mr. But she's not identified any authority that supports that theory. And in her brief, she even quotes Mr. That is direct reports where the, who the custodians report to. Mr. Testify that her direct supervisors were Tony Rios, James, the goal at Ortiz and Russ Vander Kooi at varying points in her employment and further testified in response to a question about whether she saw Mr. On a day to day basis at district 5 that she had never seen Mr. Lemos come into any police department. And as the district court found, even if Mr met her burden to establish that the other Hispanic employees were similarly situated, the conduct of those employees was substantially dissimilar as the city set forth in its brief. Neither Mr. Nor the decision maker, James Williamson supervised these frontline custodial employees and would not have witnessed any of the behavior that would establish the basis for possible discipline. Rather, the frontline supervisors that I mentioned a few moments ago, manage the day to day employment of those employees, and they have the discretion of when and how to escalate conduct for possible discipline. And this framework that I've just described discipline could vary widely depending on the supervisor. If, for example, one supervisor doesn't manage their employees at all. And another another supervisor, contrary to that, micro manages their employees and escalates every issue no matter what. And I think that's what forms the basis in this court for determining how to compare discipline decisions that come from varying supervisors and why it's a requirement that the supervisors have to be the same when drawing reasonable comparisons. Mr. Then asserts that an HR employee, Christina Howard dictated the city's ordinary response where an employee misrepresents the nature of their employment on a Facebook profile. But Miss Howard was not a decision maker and she had little knowledge of the facts. Miss Howard assumed the conduct took place outside of work. When Mr. Testified that the photos were taken in police buildings during work time. And Miss Howard makes no mention of any ordinary response in her email, or whether an employee could be terminated or would be terminated in that situation. Well, where does it say in the email that she had assumed that it was taking place? You said outside of work. Yeah, I believe I believe you're under the language in the email is photos that are take that are put on a Facebook profile outside of work. Well, okay, I'm not I'm having trouble following you. It wasn't outside of work. It was on a personal Facebook page. Correct your honor, and it was on a personal Facebook page, but the evidence in the record shows that Mr. Actually had the photos taken of her. And I think some of the photos she took herself within the, the police building, the, the, I think it's referred to as, and that she posted those photos with the help. I believe of another officer during work time. Okay. Understand. Is she challenged that the location? I thought that was pretty clear that that's where the pictures were taken were at work. That's correct. Your honor, she made that admission in her testimony. But, but how, how do we discount Miss Howard's email is some circumstantial evidence of pretext. It does suggest that the ordinary reaction of Denver would be to just counsel the employee and clarify expectations. And, in fact, with regard to what she did, she seems to downplay the magnitude of what the scurvy did some concern as, as the employee list DPD as an employer and as Mr representing their role. So, at least for the minimal burden for the plaintiff to prevent provide circumstantial evidence of pretext. Why isn't this enough. I think it provides some, your honor, but not enough. And I'll clarify that by saying that, as I mentioned, I don't think Miss Howard understood that the scale or the, or the concerns of that situation. She had just, it had just come to her attention and then she passed it along to Mr limos to conduct an investigation. And so, I think the other, the other thing I'd point out, your honor, is that in that email. She sort of hesitates Miss Howard in terms of how she trend when she transitions, I should say, at the latter part of that middle paragraph of the email or she notes that this is serious where she is noting that she works for the police department and is representing herself as a police officer. So she sort of admits that, you know, maybe there's a scenario where a reasonable response as you clarify expectations, but I note that there is a serious component to this, but she doesn't use the word serious or component, she says some concern. Oh, concern. I'm sorry, your honor. She uses the word concern. Now, and nobody cited any deposition testimony of this Howard, which I would have assumed that somebody would have asked her what she bet about this, but nobody cited any deposition testimony. Was she deposed? I believe she was deposed and you'll have to forgive me, your honor, because I did not litigate this case and I did not see and I agree with you. I did not see that in the record in this case. So, I'm able to answer that question for your, your honor. My apologies. Okay. And then I'd note that, you know, lastly, you know, this, this email from Miss Howard, just 1 last point about it. She doesn't address the situation where an employee has violated the crew service rule relating to dishonesty or prohibiting dishonesty for the 2nd time. And that was obviously a big point of contention in the, in the city's decision to terminate Miss Drovic's employment. So, just in some on the, on the, but for cause element, you know, Mr failed to establish a prime official case of reverse discrimination in the city's position as the district court properly dismissed her claim. But for causation is why Mr retaliation claim also fails. Mr. simply not presented any evidence of retaliatory animus on the part of the decision maker. Mr. Williamson, based on any alleged prior complaints, you may have raised about Mr. She, she could not identify whether or how Mr. Williamson retaliated against her and throughout her lawsuits repeatedly pointed to Mr. Although Mr asserted in her opening brief that she complained to Mr. Williamson about Mr. The court noted during Mr opening argument that that complaint took complaint took place during a meeting in May of 2017. And that's when Mr received her written reprimand. And that's about which the complaint was made. You're acknowledging that Mr. Williamson had relied on. Mr. Lee Moses prior reprimands. And she does have evidence of Mr. Moses retaliatory motive. I don't know. I don't think it's clear that Mr. Williamson relied on the previous reprimand in terms of making this decision to terminate Mr. Employment. I do. Obviously, it was noted. I agree. Your honor in the, in the dismissal decision that she had a prior disciplinary history. And I think I may have missed the 2nd part of your question. Your honor. I apologize. I don't want to do real things, but I had, I had thought until prior to the argument. That the Denver was simply relying on the, the 1 act of posting this on the face on her Facebook page. And then being deceptive about it, but I thought you were saying a few moments ago that it wasn't that simple that Mr. Williamson was in fact relying on the fact that this wasn't her 1st deceptive act that she had been counseled about the building episode in May. And so this was this. She was a recidivist. This was her 2nd or 3rd infraction. And if, if you're relying, I don't know that you can have your cake and eat it to say that it was the 3rd infraction. Mr. Williamson had no retaliatory motive, but if he's relying on this being her 3rd infraction, and the 1st 2 were attributable. To a supervisor, Mr. who did have a retaliatory motive. It seems to me that Mr. is at least. Way of looking at it is correct that retaliatory motive. Ultimately was a substantial factor in Mr. Williamson's eventual decision. Well, your honor, I will agree, and I'm going to try to wrap this up very briefly in respect of his time, but I think what the city's position is that the decision was made on the basis of the Facebook post and the dishonesty as well as the other sort of tangential issue that was noted in the dismissal letter. But as part of the city's progressive discipline policy, that prior discipline was considered as as, you know, as, as a holistic review of the disciplinary process. So, I would provide that response runner and I will, I will wrap up my time and I apologize for going slightly over what we'd agreed upon. Thank you. Your honors. Well, it was our fault and my fault. So, we're going to give Mr. Watts an additional. So, Kevin, stop stop the clock. Uh, Mr, uh, or judge Murphy, do you have any additional questions? No. Okay, just Briscoe to you. No, no, thanks. Okay. And, uh, like I said, we'll give Mr. Watson additional minute. Thank you, your honors and happy new year. I'm Michael Watson here for and the 2 employees who were sued Kyle and Joel. To briefly summarize our position. And its employees are private contractors. There are 2 claims against them in this case. 1983 and 1981 claims, both stemming from what has been called the bolo poster throughout the case. It's a be on the lookout. A poster sheet of paper. Prepared by at the city's direction. Summary judgment was granted for us, and we would request that the court upholds that and for the 1983 claim. 2 points, really 3 points acted as an intermediary with no decision making authority. So the question really becomes, is there a retaliatory motive? And there was no evidence of a retaliatory motive against this. And. Ultimately, the underlying court found that there was no evidence that HSS knew, or should have known. That the bolo sign might violate plaintiff's rights. And we stand by that position today that this was a simple poster created at the city's direction with no. No decision making authority back with. Well, aren't some things just assumed? I mean, issuance of a bolo. I would think most people would say this could have some effect on the person who's a subject of this. Of this sign, your honor, thank you. And the, the way the evidence came out in the case was HSS created it and kept it for their own use. So it wasn't posted around the buildings where. Miss Jarvis worked, it was. For the HSS employees, so they could know, okay, if we see her here. We know what to do, and they can report to their supervisor and HSS offices. That's the only place. It was posted correct. I don't know if you can call it an office, but their kiosk of sorts with, they had a binder where they would keep items like this. Was it was it posted on the wall? So if someone came to your office, could you could they see it? Could the public walk in and see this? No, the evidence from the HSS testimony from Mr. Nodler and Mr. Was it was kept in a folder or binder, and it wasn't displayed to the public. It was kept with the HSS materials. Thank you. Wasn't that disputed didn't play to present contrary evidence that others had seen it. And asked her about it. Ultimately, she says that's how she found out. But my recollection of the record, your honor, she didn't. Provide evidence showing that it was posted somewhere. It was typically when a plaintiff says typically what a plaintiff says in a row. This is evidence for purposes of summary judgment. So, if the plaintiff says that I learned about it because somebody told me that I'm not supposed to be in the building. That seems to be evidence from which a fact finder, if they credit, it could find that it wasn't insulated to. You know, to behind quarters that others had learned about it. Understood and I know that at this point, she had been terminated. And I think that helped inform the courts decision that there was no. No evidence that HSS or its employees could have reasonably foreseen that the poster just. Alerting themselves that she shouldn't be there would actually. Potentially impact her rights. Okay. And I'm over time, so I put the 1981 claim was much, much shorter, just that there was no evidence that HSS or its employees intended to discriminate on the basis of race. And no evidence was presented to the contrary. Okay, judge Briscoe, do you have any additional questions? No, thank you. Judge Murphy. No, thank you. Thank you. We'll give additional 1 minute to the appellant. Mr. Davidovich, you're on mute. Thank you. Sorry about that. Judge Briscoe with regard to your question about where it was posted. In fact, wasn't posted in the office of HSS was posted the police building. Anybody walking in would pass by the security desk. And that's how in fact. Plaintiff found out about it by three, two women telling her, we saw you on a poster then taking her over there and showing her the poster. That's clear, that's clear the evidence on retaliation. Are you saying that there's evidence that others saw it. And that evidence in this record. Absolutely. Absolutely. It's the, it's the testimony. It's in the deposition, which is attached of Jehovah, where she said she returned to work she was not terminated as counsel said when the bolo posters were put out. She was on suspension. She returned to work. I believe was October 3rd, 3rd or 4th. And she was confronted by two ladies said we're going to call the police on you because you shouldn't be in this building we saw your picture and she said what. And then they used to where you see it. Sorry, we lost Judge Briscoe again. Oh, we do. Sorry. You. Sorry, there is that evidence in the record. That's how she found out about it. And further, she wasn't, it wasn't terminated when those polar posters came out. One of the posters at the, there were three different ones, one of them actually said she was no longer working there. She was terminated but which wasn't true. But that evidence is in there. Judge Murphy. But she had been suspended right. This is long terminated it was when she was under the damn day suspension, right, she was suspended. Correct. But not terminated. Did you cite that evidence in your response to the summary judgment. I did. I didn't recite it. Is there any objection to that as being her side. I don't recall that there was. Okay, it was it was it's it's it's in the it's in the deposition and. Well yeah but it's not it's not I'm not sure it's admissible. Yeah, I can't tell you but I don't believe there was any objection. Okay. But that is in the evidence. The only other thing I would would mention is that background as you noted, the decision by Williamson was based on not only the Facebook but if you look at the notice of discipline of final discipline of termination. It included all those priors as well, which then brings us back to the same situation. Your Honor is I'm out of time. I thank you very much for all me to proceed on behalf of Mr. And I urge you to overturn and send this matter back to district court so that credibility determinations can be made by the finder of fact, not by the court. Thank you, Mr. Judge Murphy Do you have any additional questions. Just Briscoe. No, I don't. Thank you. Okay, thank you. This court. Well, I'm going to adjourn court and then I'm going to ask my colleagues to stick on the video. A court is adjourned. So if you recall, thank you very much counsel.